# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT
## OF TENNESSEE
## KNOXVILLE

TRAVIS WILLIAMS )
)
)
)
PLAINTIFF. )
) DOCKET NO. 3:24-CV-00076
V. )
)
ALKERMES, INC. )
)
DEFENDANT. )

_____

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S
## MOTION TO DISMISS

**COMES THE PLAINTIFF, TRAVIS WILLIAMS,** filing this Response in Opposition to Defendant's Motion to Dismiss. He shows:

## I. INTRODUCTION

Defendant suggests Plaintiff's Complaint "borders on the frivolous," using "bombastic language" and "blustering rhetoric and italics." (D.E. 14, Memorandum, p. 1). Plaintiff does not mind these sharp elbows as part of the adversarial process.

But it's more accurate that Plaintiff's Complaint is thorough. It's detailed. And it is a painfully cruel and devastating account of Alkermes watching a man's career be destroyed by a woman, Jodi Garcia, because of DEI run amok in corporate America. It easily satisfies the standard for facial plausibility—"factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Dual Diagnosis Treatment Ctr. v. Bluecross Blueshield*, 2022 U.S. Dist. LEXIS 168666, *4 (E.D. Tenn. 2022)(Corker, J.).

Plaintiff's Amended Complaint canvases a problem with racial balancing in the wake of George Floyd's death, racial "mirroring" sought at Alkermes, false allegations *because of race* made against Williams, and Alkermes' deliberate choice to fire him rather than confront those obvious falsities. Alkermes was afraid to do the right thing due to misplaced corporate optics, instead "watching Williams be destroyed simply because he is a white male." (D.E. 12, Complaint, Introduction, ¶9).

## II. FACTS IN THE WELL-PLED COMPLAINT

The Amended Complaint is factually rich. Travis Williams' employment history includes earning highest honors at the pharmaceutical company Alkermes. (D.E. 12, Complaint, ¶11). He is a white male.

In the wake of the death of George Floyd, Williams alleges that Alkermes went to substantial lengths to publicize issues of racism and bias in the workplace, including race-based diversity and mirroring goals. (*Id*. at ¶¶17, 18, 19). Stories of racism "saturated" Defendant's work environment. (*Id*. at ¶19).

### A. False Allegation of Sexual Assault

In 2023, Williams experienced a *false* accusation planted by a black female named Jodi Garcia during a company event in Orlando. (*Id*. at ¶21, 22, 25, 29). Despite Garcia's allegation, which reached both higher management and human resources, no one even spoke to Williams during the event. (*Id*. at 27).

On March 6, 2023, four days after the event, human resources spoke to Jodi Garcia, the originator of the allegation, by telephone (*Id*. at 28), along with a minority co-worker who reports directly to Garcia (*Id*. at 31). Garcia claimed Williams struck her bottom.

Hernandez, who did not see it, said she recognized the noise of a paddle hitting a "jumpsuit" (an *ear* witness). (*Id*. at 28, 31).

Hours later on March 6, an "anonymous email" from hopeispossible7@gmail.com, was submitted to all of the white executives within Alkermes. (*Id*. at 32). Given the timing and the information in the email, it was obviously being sent by, or at the behest of, Garcia herself. (*Id*. at 33). It was said to be from a "witness." (*Id*. at 34). But the allegations changed substantially.

Apparently not satisfied with the reaction to Garcia's original allegation, or Hernandez being an ear witness, the email both *contradicted and exaggerated* Garcia's allegations hours earlier. (*Id*. at 36). Making the allegations even more sinister, with deep racial overtones, the email alleged Williams "sexually assaulted and groped" Ms. Garcia, including by "slapp[ing]" Garcia in the "derriere" and that he also "grabbed and squeezed her." (*Id*. at 37). The email claimed Williams "put his arms around her neck and pulled her in very close to him." (*Id*.)

Injecting race to the all-white executive recipients, the email stated: "I am certain that this will be glossed over because Mr. Williams is a <u>white male</u> *and part of the 'good old boy Network.'*" (emphasis added). It added that Williams "*compounded the situation tenfold since Mrs. Garcia is a <u>woman of color</u>*" and that it appeared Williams was "*just trying to assert his authority and dominance over her."* (*Id*. at 39 (emphasis added)).

At this point, it was reasonably apparent that Garcia's allegations were falling apart because, factually, neither Garcia nor Hernandez had said anything about groping, squeezing, or putting arms around her neck in front of a crown. (*Id*. at 38). Certainly,

Garcia would have known about choking and groping had it actually occurred—which it did not.

**B.  Plaintiff Pleads that Alkermes Intentionally Chose to Destroy a White Man's Career Instead of Reckoning with the Optics of False Allegations by a Black Woman**

In the hysteria of this accusation of a white man "sexually assaulting" a black woman, trying to "assert his authority," and the email taunting the white executives, Alkermes spoke to none of the District Business Leaders (DBLs) present at the event in Orlando. (*Id*. at 40).

As important, the very next day, March 7, 2023, Alkermes made the decision to terminate William's employment without even speaking *to him*. (*Id*. at 42).  That is, the decision was announced internally, by the head of the Vivitrol Sales Team, Greg Keck, before Williams was interviewed. (*Id*. at 43, 44).  By the time Williams was made aware of the allegations, the decision on his employment already had been made. (*Id*. at 44).

Even when advising Williams, Alkermes withheld key details about the assault allegation. (*Id*. at 45). This led Williams to believe the matter involved the routine "jostling" during the game itself—hardly a sexual assault or groping or putting arms around one's neck. (*Id*.).

When Keck formally delivered its termination decision to Williams, Alkermes omitted the contradictory, anonymous email Garcia had arranged. (*Id*. at 41). Defendant terminated Williams in spite of Williams' outstanding history, his denial, and the "flatly contradictory, exaggerated, unreliable, and inconsistent evidence." (*Id*. at 43).

Williams alleges that Defendant had made its decision to appease a black female regardless of truth. The investigation was not just "shoddy," but it was *dishonest*, a placation of a black female to avoid a racial conflict. (*Id*. at 46).  Put simply, in the wake

of George Floyd and the DEI optics Alkermes was championing, it was unwilling to confront the truth of a black female making a false allegation against a white man. It sacrificed the white man *not* because it honestly believed the black woman, but because its corporate DEI narrative required taking her side (without even speaking to Williams).

Anticipating Defendant would attempt a motion to dismiss for insufficient factual pleading, in paragraph 51, Plaintiff sets forth facts and inferences leading to the inexorable conclusion that Defendant deliberately chose to honor Garcia's false allegations rather than take the uncomfortable step of addressing false allegations by a black female:

- There was no game interruption whatsoever despite claims of Garcia cursing out Williams and being "so aggressive in front of a crowd."

- Williams and Garcia's superior, Bauer, saw nothing of the sort alleged by Garcia.

- Williams' table was nowhere near Garcia's table. Garcia claimed the events happened at the "front of the room." However, Alkermes failed to speak to more than a dozen personnel at the front of the room, all who *deny* the false allegations with the paddle, and groping, and putting hands around a neck, and all would have certainly seen and heard Garcia's volatile reaction had it actually occurred (and it did not).

- Human Resources conducted no investigation on site on March 2, 2023, even though Garcia made her false allegation at that time.[1]

- The three "witnesses" consisted of Garcia, a person who reported to Garcia, and an "anonymous" email obviously linked to Garcia. But even then, these "witnesses" told vastly different stories within hours.

  o Alkermes ignored, or did not seek, information showing the link of the "anonymous" emailer to Garcia—perhaps

---

[1] The Human Resources Manager, Stephanie Walker, was on site at Orlando. (D.E. 12, Am. Complaint, ¶26).

because it was so obvious in timing and scope of information.

o Alkermes never returned to Garcia (or Hernandez) to explain the obvious and gross inconsistencies in the information received within hours of their interviews.

o By this point, Alkermes surely realized the discrimination was *against Williams, not by Williams.*

- Alkermes decided to terminate Williams before even speaking to him. By design, Alkermes was choosing to support a black female it reasonably knew was engaged in discrimination rather than to confront her and face the race-baiting accusations that Alkermes' will bow to the white male.

- Alkermes failed to disclose details to Williams to support its already-made decision by not presenting the actual allegations: the sexual assault, the groping, the squeezing, the grabbing by the throat.

o Thus, Williams was not allowed to present the strident racial views of Garcia, to present evidence to the contrary, to offer witnesses of his own, or photographs, or the Facebook messages, or information bearing on Garcia's lack of credibility.

(Id. at ¶52). And in sum, Alkermes possessed clear evidence of the false allegation, but, in the end, Alkermes was baited by race and gender and knowingly acceded to it. (*Id*.)

Should there be any remaining doubt in the pleadings that Alkermes fears its black employee, Garcia, to the point of accepting her false allegations to avoid a lightning rod of false racial allegations, Plaintiffs have gone even further. The Complaint shows how Garcia *continues* to goad and play Alkermes—a sick game to be sure.

Garcia had the Regional Supervisor fired for making a comment about the paddle that Garcia (falsely) claimed Williams used upon her bottom. (*Id*. at 55). Then she anonymously published defamatory information on a pharmaceutical website ("CafePharma"), about Williams, prompting other Alkermes' employees to state they knew

it was her, and suggest she seek mental help. (*Id*. at 56).  Finally, and dramatically, at the very next national sales meeting, Garcia laughingly distributed this hand paddle to the attendees as if it were a joke how she destroyed Williams' career:



(*Id*. at 58).

Despite all of this, Alkermes' white executives remain in quicksand, paralyzed by fear to take action against a black female. (*Id*. at 59).  The reasonable inference, in the light most favorable to Plaintiff, is that Alkermes cares about outward *appearances* about race, not truth.

### C. Post-Employment

After Alkermes aligned with Garcia in terminating Williams on false grounds, and after Williams filed with EEOC, Garcia, still employed by Alkermes, went further. (*Id*. at 59-60).  She published defamatory statements on an industry-wide pharmaceutical site falsely, continuing through April 26, 2024 (the latest as of the filing of the Amended Complaint) alleging that Williams, using his initial, "T.W.," was fired for assault. (*Id*. at 63).  Alkermes continues to stand pat as William's career is being destroyed. (*Id*. at 65).

### III.    1981 AND TITLE VII CLAIMS

Beginning at page 6 of its Memorandum, Defendant argues for dismissal of Plaintiff's Section 1981 and Title VII claims. (D.E. 14, Memorandum, p. 6).

In the employment law context, §1981 is closely related to Title VII of the Civil Rights Act of 1964. For this reasons, *both* claims may be asserted. *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 455 (2008)(recognizing a "necessary overlap between Title VII and § 1981")(cleaned up). *See also, Johnson v. City of Memphis*, 73 Fed. Appx. 123, 129-130 (6th Cir. 2003) ("We hold that Plaintiffs are permitted to file employment discrimination claims under both Title VII and § 1983 because they alleged in their second amended complaint that Defendant's conduct violated both statutes.")

### A. Pleading the Elements of the Evidentiary *McDonnell Douglas* Prima Facie Test Is Not Required

Defendant appears to misunderstand an important legal distinction between *pleading* a case under Section 1981 and Title VII versus *proving* the case at the summary judgment stage. Defendant conflates an *evidentiary* standard under *McDonnell Douglas* with the *pleading* standard for complaint-sufficiency. They are different:

> Title VII plaintiffs need not allege the elements of a prima facie case under the familiar *McDonnell Douglas* framework to avoid dismissal. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002) (holding that *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), sets forth an evidentiary standard, not a pleading requirement); *see also Keys*, 684 F.3d at 609-10. Rather, a complaint alleging discrimination and retaliation claims need only allege factual content sufficient to allow a court to "draw the reasonable inference" that the employer discriminated or retaliated against the plaintiff. *Id.* at 610 (quoting *Iqbal*, 556 U.S. at 678-79).

*Lee v. Vanderbilt Univ.*, 2023 U.S. App. LEXIS 15820, *8 (6th Cir. 2023); accord, *Keys v. Humana, Inc.*, 684 F.3d 605, 610 (6th Cir. 2012) (quoting *Iqbal*, 556 U.S. at 678, 679); *same,* Oliveira-Monte v. Vanderbilt Univ., 2023 U.S. Dist. LEXIS 36712, *4 (M.D. Tenn. 2023). Thus, for complaint sufficiency, there is no requirement to allege with specificity that a similarly situated employee who was not part of the protected class was treated more favorably. *Id.* at *10.

Despite the basic law of pleading, Defendant's brief alleges that "all material elements" must be pled. (D.E. 14, Memorandum, pp. 2, 5, 6, 7, 8). Defendant leans too heavily on the phrase "contain either direct or inferential allegations *respecting all the material elements*," from *Smith v. GM LLC,* 988 F.3d 873 (6th Cir. 2021). (*Id*. at pp. 5, 6). But *Smith* does not say that elements themselves must be plead, nor that *McDonnell Douglas* elements, in particular, must be set forth. *See Lee v. Vanderbilt Univ, supra*.

## B. McDonnell Douglas Does Not Always Apply

Mucking pleading and summary judgment practice together, Defendant moves into a lengthy *McDonnell Douglas* summary judgment analysis—arguing whether certain paragraphs in the Amended Complaint, like paragraphs of 72 and 74, fit a *prima facie* stage or pretext stage of proof. (*Id*. at pp. 7-8).[2] At this stage, no proof has been taken. The parties do not even know whether direct evidence or circumstantial evidence will be the model.

This illustrates why the *McDonnell Douglas* model is inappropriate at the motion to dismiss stage:

> In addition, under a notice pleading system, it is not appropriate to require a plaintiff to plead facts establishing a prima facie case because the *McDonnell Douglas* framework does not apply in every employment discrimination case. For instance, if a plaintiff is able to produce direct evidence of discrimination, he may prevail without proving all the elements of a prima facie case. See *Trans World Airlines, Inc.* v. *Thurston,* 469 U.S. 111, 121, 83 L. Ed. 2d 523, 105 S. Ct. 613 (1985) ("The *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination").

*Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 511 (2002).

---

[2]      D.E. 12, Am. Complaint, ¶¶ 72, 74.

### C. Proving Discrimination Circumstantially Permits Alternative Fourth Element (including a flexible, non-comparator element of *McDonnell Douglas*)

Again, this case has not reached an evidentiary stage. No "proof" yet exists at this pleading stage. Undoubtedly, Defendant is trying to preclude the rich production discovery will afford— not only at Alkermes, but Garcia's history of this type of conduct in the industry.[3]  However, the entire legal premise of Alkermes' motion is dreadfully wrong, even under a circumstantial test at summary judgment.

Even *if* an evidentiary standard of pleading the *McDonnell Douglas* elements were used at this motion to dismiss stage, and it clearly it should not be, Williams' Complaint would *still* be sufficient in a circumstantial analysis. Throughout, Defendant presupposes that the fourth element of a prima facie case of both the Section 1981 and Title VII claims is exclusively that of a similarly situated comparator being treated differently. (D.E. 14, Memorandum, pp. 7). It goes on to discuss how that fourth element of a comparator must have engaged in the "same conduct" of "comparable seriousness." (*Id*. at p. 10).

With that comparator premise, Defendant delves into *McDonnell Douglas,* doubly emphasizing this line:  "Plaintiff does not get to the pretext stage of the *McDonnell Douglas* analysis because he has not alleged a prima facie case of discrimination." (*Id*. at p. 9).  It's all incorrect.

Ignoring for the moment that Defendant confuses pleading with proof, and motions to dismiss with motions for summary judgment, the fourth element of *McDonnell Douglas* is not fixed, but rather flexible.  A comparator treated differently is only *one* method of proving a circumstantial case of discrimination under *McDonnell Douglas*.  It is not the only method.  And,

---

[3] *Olson v. Takeda Pharms. Am., Inc. and Jodi Garcia*, 2024 U.S. Dist. Lexis 11394 (M.D. Fla 2024)(denying motion to dismiss discrimination case involving the same Jodi Garcia).

once summary judgment is reached, use of direct evidence would dispense with *McDonnell Douglas* entirely.[4]

To establish a *prima facie* case of discrimination predicated upon circumstantial evidence, a plaintiff must prove, by a preponderance of the evidence, that: (1) he or she is a member of a protected class; (2) he or she is qualified for the position; (3) he or she suffered an adverse employment action; and (4) the circumstances indicate that race or sex played a role in the adverse employment action. *See McDonnell Douglas Corp.*, 411 U.S. at 802; *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001). Note the fourth element is more flexible, focusing on "circumstances."

In that vein, in the *Yates* case, the Sixth Circuit explained that a similarly situated comparator is not fatal to a complaint where "additional evidence exists…that indicates discriminatory intent in 'light of common experience.'" *Lindsay v. Yates*, 578 F.3d 407, 416 (6th Cir. 2009); *Chapman v. Olymbec USA, LLC*, 2023 U.S. Dist. LEXIS 37947, *17 (W.D. Tenn. 2023)(collecting cases applying *Yates'* additional evidence standard); see also *EEOC v. Memphis Goodwill Indus.*, 675 F. Supp. 2d 846, 850 (W.D. Tenn. 2009)("these elements [of *McDonnell Douglas*] are flexible and should be tailored to each case based on the relevant facts.")

In *Yates*, the Sixth Circuit expanded that comparator evidence is simply the most common method, not the exclusive method, for establishing a prima facie case:

> But while a discriminatory inference is *usually*, and perhaps most readily, generated through evidence of unfavorable treatment of the minority plaintiff vis-a-vis similarly-situated individuals, *McDonnell Douglas* and its progeny do not require this *always* be the case as the Yateses contend. *Cf. Shah*, 816 F.2d at 268 ("individual disparate treatment . . . cases *generally* require indirect evidence from

---

[4]    Reverse discrimination cases may be analyzed through direct evidence or circumstantial evidence. *Martinez v. Cracker Barrel Old Country Store, Inc.*, 703 F.3d 911, 915 (6th Cir. 2013). Direct evidence cases do not require steps of inferential proof. *Id.* But even for circumstantial evidence cases, the fourth element is not necessarily use of a comparator.

which an inference of discriminatory motive may be drawn, namely, comparative evidence demonstrating that the treatment of the plaintiff differs from that accorded to otherwise 'similarly situated' individuals who are not within the plaintiff's protected group.") (emphasis added) (citation omitted). As this Court has recognized, the *prima facie* inquiry "was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *Irvin v. Tenn.*, 826 F.2d 1063, 1987 U.S. App. LEXIS 11206, *7, WL at *3 n.4 (6th Cir. 1987) (Table) (quoting *Furnco*, 438 U.S. at 577). A *prima facie* case is established whenever the actions taken by the property owner lead one to reasonably "infer, if such actions remain unexplained, that it is more likely than not that such actions were based on discriminatory criterion" such as race. *See Furnco*, 438 U.S. at 576 (quoting *Teamsters v. United States*, 431 U.S. 324, 358, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977)). Keeping this ultimate inquiry in mind, we find that so long as "additional evidence" exists -- beyond showing the first three elements of the *McDonnell Douglas* test -- that indicates discriminatory intent in "light of common experience," the required "inference of discrimination" can be made in satisfaction of the *prima facie* case. This holds true even if the plaintiff is not necessarily able to identify similarly-situated individuals outside of the relevant protected group who were treated more favorably.

*Yates*, 578 F.3d at 417-418.

The "additional evidence" permitted by the *Yates* case is variable, depending upon

the circumstances of the individual case:

The "additional evidence" which can be relied upon to establish a *prima facie* claim depends on the attendant facts and circumstances. *See Blair*, 505 F.3d at 529 (citing cases that "merely [offered] various context-dependent ways by which plaintiffs *may* establish a *prima facie* case, and [did] not [establish] rigid requirements that all plaintiffs with similar claims must meet regardless of context") (citing *McDonnell Douglas*, 411 U.S. at 802 n. 13). In this case, the suspicious timing of the termination of the purchasing agreement provides the evidentiary basis for inferring the Yateses acted with discriminatory motives.

*Id.*; see also, *Faure v. Ohio State Univ.*, 2021 U.S. Dist. LEXIS 238314, *28-30 (S.D. Ohio

2021)(more examples); accord, *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328

(11th Cir. 2011)("[E]stablishing the elements of the *McDonnell Douglas* framework is not,

and never was intended to be, the *sine qua non* for a plaintiff to survive a summary

judgment motion in an employment discrimination case. Accordingly, the plaintiff's failure

to produce a comparator does not necessarily doom the plaintiff's case. Rather, the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent").

In *Yates*, the "circumstances giving rise to an inference of unlawful discrimination" included "suspicious time" between learning of the home purchaser's race and the cancellation of the housing contract. *Yates*, at 418-20. And in *Chapman*, *supra*, the circumstances included "an entirely false allegation" made against the employee. *Chapman*, 2023 U.S. Dist. Lexis 37947, at *19.

As the Background section shows, Plaintiff set forth *highly* detailed facts involving race, DEI, accepting false allegations for optics, and making an employment decision before even interviewing Williams—in spite of the allegations falling apart for inconsistencies. (D.E. 12, III. Facts, ¶¶10-66).

After digesting the facts, one may return to the *legal* paragraphs of 72 and 74 cited by Defendant. Such legal "framework" may be useful in a complaint. *Iqbal*, 129 S.Ct. at 1950. Paragraph 72 states: "Williams, who is white, was exceptionally well qualified for his position, he was terminated by Alkermes, and, not only was he treated differently in the "investigation," the circumstances, timing, falsity of the accusation, and other evidence clearly indicate his race played the key role in the adverse employment action." (*Id*. at ¶72). As in both *Yates* and *Chapman*, Plaintiff *has* alleged the "elements," including the suspicious timing and false allegations (along with other evidence of race).

**D. Differential Treatment Due to DEI**

Even though differential treatment of a comparator is not required to be pled, or even required to reach the jury under *Yates*, Plaintiffs note that they have pled differential treatment based upon another accused.

The Complaint sets forth the policies applicable to *all employees,* including DBLs like Williams. That includes decisions being made without regard to race. (D.E. 12, Complaint, ¶12 (U.S. Employee Handbook)).  And even more particularly, it includes the "Investigation Procedures" for all employees. (*Id.* at ¶14).  Those procedures require not only an investigation that is "fair and thorough," but one to "ensure due process *for all parties*." (*Id.*)

Prior to George Floyd's death in 2020, Plaintiffs have plead that Alkermes did follow its Handbook—not just generally, but in "cases of alleged employee harassment." (*Id.* at 49).  And even more particularly, in its investigations, Alkermes "certainly heard from both sides," "evaluated contradictory allegations," and did "ensure due process for all parties" *before making a decision*. (*Id*)

Pointedly, Plaintiff alleges that allegations of sexual harassment (same conduct for which Williams was accused) were leveled against another white, management level employee (same as Williams). (*Id.* at 49). And, true to its handbook, *in the past*, race of the participants was not a factor because the policies were adhered to. (*Id*)

But Alkermes' abandoned this stance with Williams, post-George Floyd, treating him differently. (*Id.* at 47, 50).  As the detailed facts support, with Williams, with these shifting sands, Alkermes wished to be "*seen* as taking the side of the black female," even to the point of accepting a known falsity, because of its "desire to avoid a racial conflict." (*Id.* at 50)

In the past, allegations were investigated for truth, regardless of race, but William's "investigation" was just for show, the outcome already determined simply *because* a black woman was making a racial and/or sexual allegation against a white male. Speaking to Williams was (literally) an afterthought. Accordingly, even though differential treatment of another accused is not a *required* element to plead, Plaintiff's Amended Complaint meets it.

In fact, the Sixth Circuit contains a long line of opinions permitting a jury to discredit a defendant's proffered reason on grounds that it is too obvious to be unintentional. See *A.C. v. Shelby Cty Bd. of Ed.*, 711 F.3d 687, 705 (6th Cir. 2013); *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998); *Airgas USA, LLC v. NLRB*, 916 F.3d 555, 563 (6th Cir. 2019)("[A]bsence of a meaningful investigation into allegedly impermissible conduct before imposing discipline is an accepted form of circumstantial evidence of antiunion animus.")(citing *Valmont Indus., Inc. v. NLRB*, 244 F.3d 454, 466 (5th Cir. 2001)). And the fourth element—causation—may be satisfied at trial in different ways. See *Barrow v. City of Cleveland*, 773 Fed. Appx. 254, 264 (6th Cir. 2019)(listing examples).

Defendant's cite to the unreported case of *Kimbrough v. Xtend Healthcare*, 2016 U.S. Dist. LEXIS 43521 (M.D. Tenn. 2016) provides it no refuge. In *Kimbrough*, the complaint made no effort to address a shoddy investigation (how others received a "more thorough investigation"), or any differential treatment. *Id.* at *4. The Plaintiff merely stated that, in a case of sexual harassment, the employer believed the accuser over herself. *Id*.

Those basic facts, standing alone, were not enough. Far different are cases involving racial or gender bias that infects an investigation. See *Menaker v. Hofstra University*, 935 F.3d 20 (2nd Cir 2019)(cited by *Doe v. Oberlin Coll.*, 963 F.3d 580 (6th Cir. 2020)). As the Complaint alludes, favoring one race (through DEI initiates) inexorably disfavors another. *Parents Involved in Cmty. Sch. v.*

*Seattle Sch. Dist. No. 1,* 551 U.S. 701, 732 (2007). (D.E. 12, Complaint, ¶6). Therefore, even if comparator were the *only* proof method, and it is clearly not, Plaintiff has cited an entirely different "accused"—*another* supervisory level employee accused of sexual harassment who received more favorable treatment. (*Id.* at 49). Obviously, Plaintiff does not have to find another employee who "paddled a co-worker on the rear end," as Defendant claims. (D.E. 14, Memorandum, p. 12).

## IV.   RETALIATION CLAIMS

In the last two decades, the Supreme Court has repeatedly underscored the breadth and importance of retaliation claims under both Title VII and Section 1981. See, e.g., *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1 (2011) (holding that making an oral complaint of unlawful conduct is protected conduct under the Fair Labor Standards Act's anti-retaliation provision); *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170 (2011) (holding that firing an employee due to the protected activity of employee's fiancee amounts to unlawful retaliation); *Crawford v. Metro. Gov't of Nashville*, 555 U.S. 271 (2009) (holding that employee engaged in protected activity when she participated in employer's internal investigation of sexual harassment allegations); *CBOCS W., Inc. v. Humphries*, 553 U.S. 442 (2008) (holding that 42 U.S.C. § 1981 provides for a retaliation cause of action for an individual who suffers retaliation for attempting to assist another); *Gomez-Perez v. Potter*, 553 U.S. 474 (2008) (holding that the anti-retaliation provision of the federal sector provision of the Age Discrimination in Employment Act provides a remedy for retaliation victims); *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53 (2006) (holding that a retaliation plaintiff need not show an adverse employment action in order to make out a prima facie case of retaliation under Title VII); *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005) (holding that Title IX prohibits recipients of federal education funding from

retaliating against an individual who complains about unlawful sex discrimination, despite the absence of any express statutory prohibition on retaliation).

For the retaliation claims under both Section 1981 and Title VII, Defendant again argues what Plaintiff must "show"—*proof,* not pleading—and cites the elements. Defendant's motion begins with what is considered protected activity, with Defendant taking the position that Plaintiff's EEOC charge may be protected activity, but not his participation in an internal investigation. (D.E. 14, Memorandum, pp. 12-13).

True, the *participation* clause of Title VII does not confer protected activity in non-EEOC internal investigations. But the *opposition* clause does. *Ford v. Memphis-Shelby Cnty. Sch*., 2024 U.S. Dist. LEXIS 77629, *16-17 (W.D. Tenn. 2024); *Mengelkamp v. Lake Metro. Housing Auth.*, 549 F. App'x 323, 331 (6th Cir. 2013) ("In a case founded upon the opposition clause, it is irrelevant that [EEOC] charges have not been filed."). Complaining to management, unions, and other employees constitutes opposition and is therefore a protected activity under Title VII. *Ford*, at 17.

In paragraphs 45 and 77, Plaintiff explains that the first step of protected activity was denying any *inappropriate* touching when finally confronted by Alkermes. (D.E. 12, Am. Complaint, ¶¶ 45, 77). And in paragraphs 60 and 78, he alleges further protected conduct by filing the EEOC charge. (*Id*. at 77).

Defendant rightly concedes the charge is protected activity. *Hubbell v. FedEx SmartPost, Inc*., 933 F.3d 558, 569 (6th Cir. 2019). This charge put Alkermes on notice of how its employee, Garcia, was *continuing* to malign Williams, post-employment at Alkermes, now threatening his entire career in the industry. (D.E. 12, Am. Complaint, ¶60). Both Alkermes, along with Garcia, were aware of the information in the Charge. (*Id*. at ¶65).

While Alkermes says "the Court can ignore" all of that evidence before the charge, that's incorrect. All of that evidence is set forth *as part of the Charge*. (See *id*.) It is powerful evidence of notice. Yet Alkermes still did nothing to control its supervisory employee, Garcia, from continuing the career-destroying conduct. As a result, *after the charge*, on April 26, 2024, Garcia used "T.W.," Plaintiff's initials to again publicly accuse him of "assault" on an industry-wide platform. (*Id*. at 63). As before, this damaging information is alleged to have been written by Garcia herself. (*Id*. at 64).

Finally, Defendant writes that none of this humiliating conduct can be attributed to *Alkermes*. (D.E. 14, Memorandum, p. 15). It focuses on whether it's vicariously liable for Garcia's actions, rather than its *own* lack of response. First, Garcia is a supervisory level employee. "[I]f a supervisor performs an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable . . . ." *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011). "A" supervisor, regardless of whether it is *Williams'* supervisor, is sufficient due to agency liability. See also, *Bledsoe v. TVA Bd. of Dirs.*, 42 F.4th 568, 585 (6th Cir. 2022)(explaining very limited circumstances where an independent investigation overcomes a biased, influenced one); *accord, Marshall v. The Rawlings Co. LLC*, 854 F.3d 368, 377 (6th Cir. 2017); *Vasquez v. empress Amb. Srv,* 835 F.3d 267, 274 (2d Cir. 2016)(employer "was itself negligent in allowing Gray's false allegations, and the retaliatory intent behind them, to achieve their desired end.").

Second, even if Garcia were merely a co-worker, an employer *can* be liable for retaliatory conduct of a co-worker, too, in these situations:

> In the Sixth Circuit, an employer will be liable for the coworker's actions if (1) the coworker's retaliatory conduct is sufficiently severe so as to dissuade a reasonable worker from making or supporting a charge of discrimination; (2) supervisors or members of management have actual or constructive knowledge of the coworker's

retaliatory behavior; and (3) supervisors or members of management have condoned, tolerated, or encouraged the acts of retaliation, or have responded to the plaintiff's complaints so inadequately that the response manifests indifference or unreasonableness under the circumstances. *Id.* at 347.

*Laster v. City of Kalamazoo*, 746 F.3d 714, 732 (6th Cir. 2014).

By virtue of the Charge, Alkermes did have knowledge and the conduct by Garcia, *to this day*, is continuing. Garcia is slowly but surely destroying Williams while Alkermes sits pat. The Amended Complaint explains how Alkermes does have knowledges and is condoning, tolerating, and/or acting with indifference. See D.E. 12, Complaint, ¶¶83-84 (describing Garcia's "unchecked" retaliatory acts and Alkermes' refusal to control this "loose cannon.").

Perhaps as a final salvo, Defendant contends that destroying a person's career on an industry-wide platform with false accusations is akin to a "petty slight or minor annoyance." (D.E. 14, Memorandum, p. 16). And, oddly, Defendant contends the post "does not identify Plaintiff." (*Id.*) But it certainly does. It clearly states his initials as the perpetrator of the assault: "T.W." (D.E. 12, Am. Complaint, ¶63). Defendant's memorandum even says so. (D.E. 14, Memorandum, p. 15).

Falsely accusing a person of assault on an industry-wide pharmaceutical platform is hardly "petty." It is adverse. "'Acts that carry a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects' may be considered materially adverse actions, but 'a mere inconvenience or an alteration of job responsibilities will not suffice.'" *Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ.*, 595 F.3d 1126, 1133 (10th Cir. 2010). Similarly, the Sixth Circuit, in the First Amendment context, recognizes that "harassment or publicizing facts damaging to a person's reputation" may be adverse. *Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 583-584 (6th Cir. 2012). And those are fact questions for a jury. *Id.* (citing *Bell v. Johnson*, 308 F.3d 594, 603 (6th Cir. 2002)).

Damage to one's reputation as an adverse action is consistent with the Supreme Court's recent decision in *Muldrow v. City of St. Louis, Mo.*, 144 S. Ct. 967 (2024). The plaintiff must show "some harm respecting an identifiable term or condition of employment." *Id*. at 974. Justice Kavanaugh, in his concurrence, maintains that the "some harm" requirement merely requires the plaintiff to show any adverse change to "money, time, satisfaction, schedule, convenience, commuting costs or time, prestige, status, career prospects, interest level, perks, professional relationships, networking opportunities, effects on family obligations, or the like." *Id*. at 980 (Kavanaugh, J., concurring).

## V. CONCLUSION

For all the reasons above, Defendant's motion to dismiss should be DENIED.

Respectfully submitted,

**GILBERT LAW, PLC**

**/s Justin S. Gilbert**
Justin S. Gilbert (TN Bar No. 017079)
100 W. Martin Luther King Blvd, Suite 501
Chattanooga, TN 37402
Telephone: 423-756-8203
justin@schoolandworklaw.com

**LAW OFFICE OF RONALD A. RAYSON**

**/s Ronald A. Rayson**
Ronald A. Rayson, Esq. (BPR #013393)
P.O. Box 10346
Knoxville, Tennessee 37939-5890
Phone: (865) 368-5890
Fax: (865) 971-4355
Ron@raysonlaw.com

***ATTORNEYS FOR PLAINTIFF***

## CERTIFICATE OF SERVICE

On May 29, 2024, I served a copy of this Response to Motion to Dismiss upon all counsel of record including Jennifer S. Rusie, defense counsel, at Jennifer.Rusie@jacksonlewis.com, and John R. Adams at John.adams@jacksonlewis.com.

/s Justin S. Gilbert